# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| EMMANUEL F. HUNTER, ) | |
| ) | |
| Plaintiff, ) | Case No. 09 C 6158 |
| ) | |
| v. ) | Magistrate Judge |
| ) | Martin C. Ashman |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Emmanuel F. Hunter ("Plaintiff") seeks judicial review of a final decision of Defendant, Michael J. Astrue, Commissioner of Social Security ("Commissioner"), denying Plaintiff's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(I), 423. Before this Court is Plaintiff's Motion for Judgment on the Pleadings. The parties consented to have this Court conduct any and all proceedings in this case, including entry of final judgment. 28 U.S.C. § 636(c); N.D. Ill. R. 73.1(c). For the reasons discussed below, the Court affirms the Commissioner's decision.

### I. Procedural History

Plaintiff filed an application for DIB on July 31, 2006, claiming that his disability began on March 23, 2006. (R. 11.) The Social Security Commission denied Plaintiff's initial claim on October 16, 2006 and again on March 13, 2008, after reconsideration of it. (R.11, 64, 72.) After a hearing held on January 26, 2009, administrative law judge Joel Fina ("ALJ") issued a written

opinion on March 16, 2009 finding that Plaintiff was not disabled. Plaintiff filed a timely Request for Review of the ALJ's decision to the Social Security Administration's ("SSA") Appeals Council. (R. 4, 275.) The Appeals Council denied review on August 4, 2009, and the ALJ's decision became the Commissioner's final decision. 20 C.F.R. § 404.981; (R. 4, 275.)

## II. Background

### A. Plaintiff's Background and Medical History

Plaintiff was born on December 16, 1953 and was fifty-three years old when he first claimed disability. (R. 11, 285.) Before 2004, Plaintiff worked as a mental health technician in Tinley Park, Illinois, a steel roll wrapper in Marietta, Georgia, and a machine operator in a company called Midwest Fastener Screws in Harvey, Illinois. (R. 94.) He also worked as a utility helper and grinder for Hoffinger Industries from 2000 to 2004. (*Id.*)

#### 1. Dr. Lester Hockenberry

Plaintiff first sought disability on March 23, 2006, claiming discoid lupus,[1] arthritis, and pain and stiffness in the knees and back. (R. 56, 191.) Plaintiff sought treatment for these ailments from his primary physician, Dr. Lester Hockenberry, from September 11, 2006 through at least June, 2009. Dr. Hockenberry's records show repeated diagnoses of stiffness in Plaintiff's legs, depression, gout, and discoid lupus. (R. 198-211.) Plaintiff's treatment notes show no diagnosis of arthritis. Dr. Hockenberry also frequently notes alcohol abuse by Plaintiff. (R. 202.) In 2007, Dr. Hockenberry submitted a medical evaluation to the Illinois Department of

---

[1] Discoid lupus is an ailment that causes itchiness and inflammation of the skin. (R. 270.)

- 2 -

Human Services concluding that Plaintiff suffered from a mental impairment caused by depression as well as various physical limitations. The latter included a twenty to fifty percent reduction in his ability to walk, bend, push and pull, a more than fifty percent reduction to his ability to stand during an eight-hour work day, and an ability to lift no more than fifty pounds at a time, with frequent lifting of up to twenty-five pounds.[2] (R. 192.) Like the treatment notes, Dr. Hockenberry's report does not include a diagnosis of arthritis.

In addition to seeing Dr. Hockenberry, Plaintiff also underwent several emergency room visits, the most relevant of which took place at Oak Forest Hospital on July 13, 2006. The ALJ described the reason for this visit as a facial rash, and an x-ray was taken following a complaint of abdominal pain. A report by radiologist Dr. Krishna Parameswar states that degenerative changes were noticed in the lumbar spine but that no "diagnostic abnormality" was shown by the x-ray. (R. 226.) Another emergency report from Oak Forest also indicates that Plaintiff was diagnosed with cocaine abuse. (R. 230.)

      2.      Psychological Evaluation by Alan W. Jacobs, Ph.D.

On November 14, 2007, Doctor Alan W. Jacobs ("Dr. Jacobs") performed a psychological assessment of Plaintiff and traced his relevant past history and background. (R. 212.) Dr. Jacobs found that Plaintiff's chief health concern was self-reported arthritis in his knees. (R. 212.) Plaintiff stated that he had trouble sleeping at night, woke up every two hours because of pain in his lower legs, and was extremely depressed. (R. 213.) Dr. Jacobs observed

---

[2] Plaintiff submitted records from Dr. Hockenberry to the Appeals Council that were not provided to the ALJ. For the reasons stated below, those records are not under consideration here.

that feelings of sadness and anger increased in Plaintiff after his second divorce and that Plaintiff drank heavily during his second marriage. (*Id.*) In terms of his general drinking habits, Plaintiff stated that sometimes he would be intoxicated for two days. (*Id.*) Dr. Jacobs' final diagnoses of Plaintiff's ailments were alcohol dependence, chronic mood disorder (dysthymia), and post-traumatic stress disorder. (R. 214.)

### 3. Physical Residual Functional Capacity Assessment

On October 10, 2006, medical consultant Virgilio Pilapil, M.D., ("Dr. Pilapil") found that Plaintiff's "exertional limitation" is an occasional lifting of fifty pounds. (R. 215, 256, 262.) Plaintiff can frequently lift twenty-five pounds and can stand and/or walk for about six hours in an eight-hour period. (R. 256.) Plaintiff can stand and/or walk for six hours in an eight-hour workday. (*Id.*) With regard to his postural limitations, Plaintiff can climb stairs, stoop, kneel, crouch and crawl frequently. (R. 257.) Dr. Pilapil further observed that Plaintiff cannot climb ladders, ropes or scaffolds because of generalized pain and stiffness causing restriction in movement. (*Id.*)

On December 5, 2007, Plaintiff was evaluated by mental health consultant Erica Altman, Ph.D., ("Dr. Altman"). In the medical summary, Plaintiff was diagnosed with affective and substance addiction disorders. (R. 173.) An affective disorder typically causes mood swings known as dysthymic disorder. (R. 176.) Dr. Altman noted that Plaintiff's ability to perform daily activities, social functions, and concentration levels were moderately limited. (R. 183.) According to Dr. Altman, Plaintiff did not appear to have difficulty understanding any procedural matters when he filed his complaint. (R. 185.) She further noted that Plaintiff completes his

household chores independently but has difficulty concentrating and remembering tasks. (*Id.*) Plaintiff can understand simple instructions and perform basic tasks. (R. 189.) Overall, Dr. Altman described Plaintiff as being polite, cooperative and mildly depressed and diagnosed him with alcohol dependence, substance abuse, and dysthymia. (*Id.*)

### B. The SSA Hearing

At the January 29, 2009 hearing Plaintiff testified that he could not work primarily because of back problems. (R. 327.) He also reported difficulty in standing for long periods of time and trouble performing household tasks. (*Id.*) Plaintiff stated that, while a normal person could walk to the store in ten minutes, it would take him twenty. (*Id.*) According to Plaintiff, he can walk or stand only for ten minutes without interruption. (R. 331.) Plaintiff stated that he spends most of his time lying down because of his lower back pain and getting up in the morning was especially difficult because of leg stiffness. (R. 331-32.) He has fallen down in the past because of weak knees and lack of balance. (*Id.*) Plaintiff cannot bend over to pick up items on the floor because of back pain. (R. 332.) He characterized his current pain at the hearing as a five on a scale of ten and testified that he takes Tylenol and hydrocodone for general pain. (R. 332-34.)

Plaintiff also testified on his mental impairments, stating that he had been taking antidepressants for a year. (R. 335.) When the ALJ questioned him about hearing or seeing things, Plaintiff replied by stating that he hears things at night and that a voice tells him everything will be fine. (R. 336.) Plaintiff also stated that he does not drink every night and drinks only a "couple of cans of beer" every other night. (R. 337.) In response, the ALJ stated that

Plaintiff's testimony was inconsistent with the information on the record, which indicates that Plaintiff drank excessively. (*Id.*) Plaintiff responded by stating that he has limited his intake of alcohol since his last visit to Dr. Hockenberry. (R. 337.) The ALJ also revisited Plaintiff's marijuana and cocaine usage history. The ALJ cited medical records that contradict Plaintiff's assertion that these drugs were only used in the 1980s. (R. 230, 342-343.) The ALJ asked whether Plaintiff disputed the facts stated in the Oak Forest Hospital record. (R. 342.) Plaintiff replied that he did not dispute the record but that the doctor failed to note that marijuana use was second-hand. (R. 342-43.)

### 2. VE's Testimony

After the Plaintiff's testimony, the ALJ called the VE to testify. The VE stated that Plaintiff's past work as a psychiatric technician typically requires medium level, semiskilled work, but Plaintiff performed his work with heavy exertional force. (*Id.*) His former job as a "grinder machine operator," discussed more fully below, would be classified as light, unskilled work, though Plaintiff performed his work at medium level. (R. 345.)

After the VE defined general work classifications, the ALJ presented several hypotheticals to understand particular tasks that Plaintiff could perform. (R. 346.) The first hypothetical consisted of a claimant that paralleled Plaintiff's age, education, and work experience who could perform medium level work. (*Id.*) The ALJ then asked whether a person with these limitations could perform Plaintiff's past work as Plaintiff performed them. (R. 346.) The VE responded by stating that the hypothetical person would be capable of performing past work as a psychiatric technician, but not as Plaintiff performed it in the past. (*Id.*) The

hypothetical person would also have the ability to continue working as a "grinder machine operator" as Plaintiff had performed it in the past. (R. 346.)

The second hypothetical contained the same factors and limitations except that the individual would be limited to simple, routine, and repetitive tasks. (R. 347.) The VE stated that the claimant would be able to return to past work as a "machine grinder." (*Id.*) A third hypothetical referenced the same individual with the ability to lift twenty pounds occasionally, lifting ten pounds frequently, and performing light work. (R. 347.) The VE testified that claimant, in this instance, would be able to perform "machine grinder" tasks as it requires a light exertional force. (R. 348.)

### III. ALJ's Findings

The ALJ made the following findings in an opinion dated March 16, 2009:

1. The claimant met the insured status requirements of the Social Security Act through December 31, 2009.

2. The claimant has not engaged in substantial gainful activity since March 23, 2006, the alleged onset date (20 CFR 404.1571 *et. seq.*).

3. The claimant has the following severe impairments: degenerative disc disease of the lumbar spine; depression; alcohol dependence, poly substance abuse, and discoid lupus (20 CFR 404.1521 *et. seq.*).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he can never climb ladders, ropes or scaffold and can never crawl. The

claimant can occasionally balance, stoop, crouch and kneel. He must avoid concentrated exposure to unprotected heights and must avoid excessive exposure to sunlight. Further, the claimant is limited to simple, routine, repetitive tasks.

6. The claimant is capable of performing past relevant work as a grinder/machine operator and psychiatric technician. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from March 23, 2006 through the date of this decision (20 CFR 404.1520(f)).

(R. 13-20.)

## IV. Legal Standard

Judicial review of the Commissioner's decision is authorized by 42 U.S.C. § 405(g), which provides that findings of the Commissioner are conclusive if supported by substantial evidence. 42 U.S.C.A. § 405(g). Furthermore, it is this Court's task to determine whether the ALJ's factual findings are supported by substantial evidence and that correct legal standards apply. *Allen v. Sullivan*, 977 F.2d 385, 389 (7th Cir. 1992). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." 20 C.F.R. § 404.901. The ALJ's legal conclusions regarding Plaintiff's application for DIB under the SSA is reviewed *de novo*. *Dotson v. Shalala*, 1 F.3d 571, 575 (7th Cir.1993). However, the scope of this review is limited, as the court "may not . . . reweigh evidence, resolve conflicts in the record, or decide questions of credibility." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).

A claim of disability is determined under a sequential five-step analysis. *See* 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. At the first step, the ALJ considers whether the claimant is

engaging in substantial gainful activity. At the second step, the ALJ evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. At the third step, the ALJ compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation proceeds to step four. At the fourth step, the ALJ assesses the applicant's RFC and ability to engage in past relevant work. If an applicant can engage in past relevant work, she is not disabled. If the applicant cannot engage in past relevant work, the ALJ then assesses whether she can engage in other work in light of her RFC, age, education, and work experience under step five.

## V. Discussion

Plaintiff argues that the ALJ's decision is erroneous on three grounds: (1) the ALJ failed to develop the record concerning the extent of his physical and mental impairments; (2) the ALJ failed to give controlling weight to his treating physician's opinion; and (3) substantial evidence does not support the ALJ's finding that Plaintiff can perform his past work.

### A. The Duty to Develop the Record

Plaintiff argues that the ALJ erred because he failed to develop the medical records to include information concerning his physical and mental limitations that was not presented at the January, 2009 hearing. In a disability benefits case, an ALJ has a duty to develop a full and fair record. *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000). This duty is heightened when a

claimant proceeds *pro se*, but the ALJ must still ensure that the record fully and fairly reflects the facts of a case when, as here, the claimant is represented by counsel. *Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997). Courts ordinarily require a significant omission before finding that the ALJ failed in her duty. *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994). Conjecture or speculation about additional evidence that might have been obtained will not suffice to warrant remand. *See Nelson*, 131 F.3d at 1235. "Instead a claimant must set forth specific, relevant facts – such as medical evidence – that the ALJ did not consider." *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009).

Plaintiff first claims that the ALJ should have ordered x-rays of his back and knees because his complaints about weakness in those areas at the hearing should have alerted the ALJ to the need for additional tests. The relevance of this argument is not clear because the ALJ found that Plaintiff's subjective complaints of pain were not entirely credible, yet Plaintiff does not challenge the ALJ's credibility determination on this issue. As a result, the fact that Plaintiff complained of pain at the hearing is not, in itself, sufficient to show why the ALJ should have ordered additional x-rays of his back and knees.

Plaintiff also contends that the ALJ should have ordered these x-rays pursuant to the Seventh Circuit's holding in *Smith v. Apfel, supra*. In *Smith*, the ALJ was aware that x-rays taken ten years before the hearing showed that the claimant was suffering from degenerative arthritis, and the Seventh Circuit held that the ALJ should have obtained more recent x-rays before determining that the claimant was not disabled. *Smith*, 231 F.3d at 437-38. The facts of this case, however, are distinguishable from those presented in *Smith*. The ALJ in *Smith* had specific evidence of the claimant's pre-existing arthritis which, as the Seventh Circuit noted, presumably

advanced during the ten years following the available x-rays. *Id.* at 437. By contrast, no prior knee x-rays, tests, or diagnoses of arthritis were presented by Plaintiff, who was represented by counsel at the hearing, and he does not point to any other medical test showing that he suffered from a progressive disease of the knees or back. While Dr. Hockenberry reported that Plaintiff suffered from "stiffness" (R. 160), the record does not show that he diagnosed Plaintiff with any specific disorder that should have alerted the ALJ for the need to order tests. Moreover, Plaintiff presents no argument as to why the ALJ should have ordered tests on his back and knees that Plaintiff's own treating physician did not require as part of treatment for "stiffness."

Instead, Plaintiff relies on a 2006 x-ray taken as part of an emergency examination for abdominal pain that also showed his lumbar spine. A report attached to the x-ray notes "severe degenerative changes in the lumbar spine." (R. 226.) The ALJ stated in his decision that the clinical significance of this x-ray was unclear. (R. 18.) Plaintiff does not object to the ALJ's finding on this point but contends that the lack of clinical certainty to which the ALJ referred should itself have shown the ALJ that further tests were needed. This argument overlooks that unlike *Smith* no specific diagnosis was made based on this x-ray. In fact, the attached report states that "[n]o diagnostic abnormality is seen in the study." (R. 226.) It is unclear if this remark refers to Plaintiff's abdomen, spine, or both, but Plaintiff does not explain why the absence of a specific finding required the ALJ to seek tests Dr. Hockenberry himself never ordered in his continuing treatment of Plaintiff. Moreover, the time period between the 2009 hearing and the 2006 x-ray was significantly shorter here than in *Smith* – two-and-a-half years versus ten years – and Plaintiff has not argued that his undiagnosed condition degenerated to such a degree in the intervening time that the ALJ should have known that he needed to supplement the record.

psychologist, Dr. Jacobs, and Plaintiff presents no argument as to why these records were insufficient for the ALJ to have reached his conclusion.

Plaintiff relies on the fact that the ALJ found that his primary mental restrictions resulted from substance abuse to argue that the ALJ should have obtained additional records on this issue. Plaintiff points out that he submitted new medical records to the Appeals Council but overlooks that when, as here, the Appeals Council has denied review, new materials submitted to the Council that were not provided to the ALJ are not part of the evidence a court reviews in deciding whether to uphold the ALJ's decision. *Eads v. Sec. of Dep't of Health and Human Services*, 983 F.2d 815, 817 (7th Cir. 1993). Even if they were in evidence, moreover, Plaintiff failed to submit records from his psychiatrist, Dr. Issac, and the records from Dr. Hockenberry are not materially different from those presented to the ALJ. (R. 286-300.) As the Commissioner notes, Dr. Hockenberry noted in September, 2006 that Plaintiff drank up to twelve beers during a weekend, and an August, 2007 emergency room note states that he was also using marijuana and cocaine. (R. 244-45.) Indeed, his own attorney admitted to the ALJ that Plaintiff's drinking was "significant" (R. 323, 341), and Plaintiff admitted to the consulting psychologist that he had drunk heavily for the preceding ten years. (R. 213.)

Like the other reports and treatment notes relied on by the ALJ, these records provide substantial evidence supporting the ALJ's conclusions in this case. Thus, Plaintiff has not shown why the ALJ should have developed the record further on any issue related to his physical or mental restrictions, and his Motion is denied on this point.

## B. Dr. Hockenberry's Medical Findings

Plaintiff also argues that the ALJ erred by not fully crediting Dr. Hockenberry's medical opinion that Plaintiff had a fifty-percent reduction in his ability to walk and stand. The ALJ found that Plaintiff was able to perform light work, which ordinarily requires a person to walk or stand at least six hours per day. SSR 83-10. Citing inconsistencies between Dr. Hockenberry's report and treatment notes, as well as differing opinions rendered by other physicians, the ALJ assigned Dr. Hockenberry's opinion only "minimal" weight. (R. 18.)

The Social Security regulations require an ALJ to give controlling weight to a treating physician's medical opinion when it is both well-supported by objective medical evidence and is not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d); *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006). An ALJ may discount a treating physician's opinion, however, when it is "internally inconsistent" or is inconsistent with the opinion of a consulting physician. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). Although contrary opinions by non-treating physicians are not, in themselves, sufficient to reject a treating physician's opinion, *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003), "an ALJ may discount a treating physician's medical opinion if it is inconsistent with the opinion of a consulting physician." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004).

Plaintiff argues first that the ALJ improperly weighed Dr. Hockenberry's decision because the ALJ's alleged failure to develop the record means that he did not have sufficient medical evidence to make such a determination. As before, however, Plaintiff does not show how additional evidence would have altered the ALJ's finding or how it would have been relevant to the ALJ's reasoning. For example, Plaintiff argues that Dr. Hockenberry was in the best position

to assess the significance of the 2006 lumbar spine x-ray noted above. This argument presents no reason for assuming that Dr. Hockenberry was any more qualified to interpret an x-ray than the radiologist who actually examined it at the hospital. It also does not address the fact that the ALJ relied on inconsistencies between Dr. Hockenberry's report and his treatment notes to assign minimal weight to Dr. Hockenberry's report.[4]

More to the point, the ALJ reached his decision in this case by relying on the expert medical opinions of various consulting and reviewing physicians, including Dr. Jacobs, Dr. Pilapil, and Dr. Altman. Plaintiff argues that it was improper for the ALJ to discount Dr. Hockenberry's opinion based on these reports because the consulting physicians did not examine him. This argument is not entirely correct either factually or legally. Part of the ALJ's RFC determination concerned Plaintiff's mental restrictions, and psychologist Dr. Alan Jacobs interviewed Plaintiff to make his evaluation. (R. 212-14.) *See Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (stating that psychologists are considered "physicians" in the sense of medical experts). As a matter of law, moreover, an ALJ is entitled to consider the opinions of consulting physicians and can discount a treating physician's medical opinion if it is inconsistent with the opinion of a consulting physician. *Skarbek*, 390 F.3d at 503; *see also Bauer*, 532 F.3d at

---

[4] Plaintiff also points to the fact that he had been diagnosed with lupus and, directing the Court's attention to page 266 of the Merck Manual, claims this could have accounted for his joint pain. While the relevance of this argument is unclear, Plaintiff's self-diagnosis is unavailing. Page 266 of the Manual covers systemic lupus erythematosus, which can produce "[j]oint symptoms, ranging from intermittent arthralgias to acute polyarthritis." The Merck Manual 266 (18th ed. 2006). Plaintiff ignores the fact, however, that Dr. Hockenberry diagnosed him with non-systemic discoid lupus (R. 192, 198) which, as the Manual further states, primarily affects the skin. The Merck Manual at 269.

608 (explaining that contradictory reports by consulting physicians provide a ground for not giving controlling weight to the treating physician).

Plaintiff contends that such opinions do not carry as much weight as a treating physician's report. However, "it is up to the ALJ to decide which doctor to believe – the treating physician who has experience and knowledge of the case . . . [or] that of the consulting physician," provided that substantial evidence exists to do so. *Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir. 1992). Plaintiff does not direct the Court's attention to any of the consulting reports relied on by the ALJ or present any argument as to why the conclusions of the consulting physicians were either erroneous or insufficient for the ALJ to have used them to discount Dr. Hockenberry's opinion. Plaintiff's only argument is that the consulting physicians did not examine him, but this contention is not sufficient, without more, to find that the ALJ erred in relying on reports that contravened Dr. Hockenberry's conclusions. The ALJ cited specific inconsistencies between Dr. Hockenberry's notes and his report, the absence of objective tests supporting Dr. Hockenberry's RFC conclusions, and the findings of the consulting physicians.

The Court's review of the record shows that the evidence cited by the ALJ supports his conclusion, and in the absence of any argument related to the content of the consulting physicians' reports, the Court finds that substantial evidence supports the ALJ's decision not to give controlling weight to Dr. Hockenberry's report. Plaintiff's Motion is denied on this issue.

### C. Plaintiff's Past Work

Plaintiff also alleges that errors related to the ALJ's hypothetical questions posed to the VE, as well as the VE's response, led the ALJ to err at step four. The VE testified, in relevant

part, that Plaintiff could perform his past job as a grinder machine operator, which the VE classified as a light, unskilled job. In his decision, the ALJ relied on the VE's testimony to find that Plaintiff was not disabled because he could perform his past work.

As Plaintiff correctly notes, an ALJ's hypothetical given to a VE must include all limitations supported by the medical evidence. *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009). He argues that the ALJ failed to do so here by not asking the VE to consider his need to use a cane in walking. According to Plaintiff, the ALJ's failure to reference the cane in his hypotheticals to the VE means that the ALJ erred in relying on the VE's testimony that Plaintiff could perform his former work as a machine grinder. This argument fails on two grounds. First, Plaintiff testified at the hearing that he needed to use a cane, but the ALJ discounted his credibility – a finding the Plaintiff does not contest. Second, Plaintiff admits that Dr. Hockenberry only prescribed the cane after the hearing. As new evidence submitted to the Appeals Council, which did not review this case, the prescription is not part of the evidence reviewed in deciding if substantial evidence supports the ALJ's finding. *See Eads*, 983 F.2d at 817. Accordingly, Plaintiff has not shown how the ALJ erred in not asking the VE to consider a person who required a cane.

Plaintiff also argues that the ALJ erred in concluding that he could perform his former job as a grinder machine operator. According to Plaintiff, he held jobs as a "grinder" and as a "machine operator" but was never a "grinder machine operator." At the hearing, Plaintiff told the ALJ and the VE that he had formerly worked as a grinder. The VE then classified his position as a grinder machine operator and determined that someone with Plaintiff's restrictions could perform this job because it requires light work. (R. 346.) Plaintiff does not argue that he cannot

do light work or that he cannot perform the tasks of a grinder machine operator. He simply contends that no evidence shows that he held the job of a "grinder machine operator."

The Court finds this argument unpersuasive. Neither Plaintiff nor the Commissioner has cited the DOT or proffered any evidence as to what differences, if any, distinguish the three job categories at issue here. Accordingly, the parties do no present grounds for determining if a "grinder" and a "machine operator" are different from a "grinder machine operator" or why the latter term is anything other than an alternate way of stating that Plaintiff was a "grinder" – which would appear to be the most reasonable interpretation of the VE's testimony. Plaintiff's argument assumes that a "grinder" position is clearly distinguishable from all other job categories. The DOT, however, includes over sixty different entries for "grinder" positions that encompass a range of industries and exertional limitations. Plaintiff does not specify which of these jobs he held or how it is different from the category used by the VE.

Instead, he cites *Prak v. Chater*, 892 F. Supp. 1081 (N.D. Ill. 1995) for the proposition that an ALJ's decision cannot be upheld if it is based on a mistaken fact assumption. In *Prak*, an ALJ mistakenly concluded that the claimant had not been diagnosed with post-traumatic stress disorder even though the evidence showed that he had. *Prak*, 892 F. Supp. at 1087. This Court remanded the case for a new hearing in light of the overlooked evidence but specifically noted that "[r]emand is appropriate only if there is reason to believe that a different result might ensue." *Id.* (citing *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989)). In this case, Plaintiff has not demonstrated either that the VE and the ALJ made a mistake of fact or, if they did, that it was more than harmless error. *See Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003) (finding that the harmless error rule applies to social security cases). Even assuming a material difference

between a grinder and a grinder machine operator, Plaintiff does not contend that a different result would have ensued at step four had the VE correctly discerned that difference because he does not deny that he could perform the work of a grinder.[5]

As a result, Plaintiff has not shown that the VE's testimony was based, as he claims, on a mistaken factual premise. Insofar as it was, however, the Court finds that Plaintiff's failure to allege, much less demonstrate, that a different result would have occurred in this case means that any error was harmless. Plaintiff's Motion is denied on this point.

## VI. Conclusion

For the aforementioned reasons, the Court denies Plaintiff's Motion for Judgment on the Pleadings and affirms the ALJ's decision.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
United States Magistrate Judge

**Dated:** December 9, 2010.

---

[5] Even if a grinder machine operator is separate from a grinder, and if the ALJ had proceeded to consider that job at step five, Plaintiff does not contend that he is unable to perform the duties of a grinder machine operator or that the ALJ erred in finding that a substantial number of such positions exist in the national economy.